NORVAL INDUSTRIES, INC., a Minnesota Corporation, John Valene, individually; Murray Valene, individually; and Marilyn Valene, individually,

v.

SUPERIOR COMPANIES, INC., an Indiana Corporation; and Superior Companies Trading Corporation, an Indiana Corporation, Defendants.

Civ. No. 4–80–457.

United States District Court,
D. Minnesota,
Fourth Division.

April 8, 1981.

Vance K. Opperman and Gerald E. Sikorski, McGovern, Opperman, & Paquin, Minneapolis, Minn., for plaintiffs.

David A. Ranheim and Daniel P. O'Keefe, Dorsey, Windhorst, Hannaford, Whitney &

Halladay, Minneapolis, Minn., and Robert S. Walters, Barrett, Barrett & McNagney, Fort Wayne, Ind. (of counsel), for defendants.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on defendants' motions for dismissal or transfer of this case to the United States District Court for the Northern District of Indiana, Fort Wayne Division.

### FACTUAL BACKGROUND

The plaintiffs in this action are Norval Industries, Inc. (Norval), a Minnesota corporation, John Valene, a Minnesota resident and president of Norval, Murray Valene, Vice President of Norval and formerly president of Federal Copper of Tennessee, Inc. (Federal), a wholly owned subsidiary of Norval, and Marilyn Valene. Murray and Marilyn Valene are Louisiana residents.

The defendants are Superior Companies, Inc. (Superior), an Indiana corporation headquartered in Fort Wayne, and its wholly owned subsidiary, Superior Companies Trading Corporation (Superior Trading), also located in Fort Wayne. Plaintiffs' verified complaint, at ¶ 6, alleges that Superior Trading "was at all times under the direction and control of Superior" during the events that gave rise to this lawsuit.

In April of 1978, Federal was heavily in debt to a bank in Tennessee. In order to put Federal back on a strong financial footing, Norval entered into negotiations with defendants whereby Superior allegedly agreed to become a 50% shareholder in Federal and Superior Trading agreed to supply all of Federal's scrap copper requirements on certain terms. The agreement was entered into on April 18, 1978, and has been referred to as the "April agreement."

The complaint alleges that in June of 1978, Leonard Rifkin, president of Superior and Superior Trading, informed the Valenes that unless they individually guaranteed payment of all past, present, or future indebtedness of Federal to Superior and Superior Trading and unless they executed security agreements in favor of Superior and Superior Trading, the defendants would refuse to perform under the April 18, 1978, agreement. On June 20, 1978, plaintiffs met defendants' demands (the "June agreement"). Included among the assets secured were shares in Gopher Smelting and Refining Co., Inc., a corporation partially owned by John Valene, who is president of Gopher, shares in Pak-tite, Inc., a Louisiana corporation wholly owned by Norval, shares in Tennessee Lead, another Norval subsidiary, and real estate owned by John Valene in New Jersey and in Hennepin County.

The complaint further alleges that in September of 1978, defendants again informed plaintiffs that they would not perform the April agreement unless plaintiffs executed a new agreement waiving all objections and defenses to the prior agreements, or defendants would foreclose on the security interests. Consequently, another agreement was executed on October 13, 1978 (the "October agreement").

Late in 1979, plaintiffs were informed by one of their banks that Reading Industries, Inc., located in Pennsylvania, was interested in buying Federal. However, defendants allegedly let it be known that they would not consent to the sale to Reading unless plaintiffs executed yet another agreement waiving all objections and defenses to defendants' prior actions and affirming plaintiffs' obligation to pay defendants for Federal's debts. Another agreement was executed on January 24, 1979 (the "January agreement"). Federal was then sold to Reading, and is now being liquidated.

Plaintiffs' complaint is in six counts. The first count contends that the April agreement is enforceable but that the June agreement, in which plaintiffs agreed to security interests, is not. The claim is that the security interest agreement was not supported by valid consideration. The second count again alleges lack of consideration for the June agreement, this time assuming that the April agreement is unenforceable.

The third count alleges that the June agreement was obtained through false representations by Leonard Rifkin, defendants' president. The fourth count posits that the October and January agreements were obtained through "wrongful economic and financial pressures." The fifth count claims that if the October and June agreements are enforceable, defendants breached them and that therefore plaintiffs are not responsible for the amounts that defendants have claimed. Finally, the sixth count argues that defendants breached their promise in the April agreement to purchase a half interest in Federal and thereby guarantee half of Federal's indebtedness to the banks.

Although defendants suggest that counts 1–5 are directed against Superior Trading and count 6 applies only to Superior, plaintiffs state that each count is directed against each defendant. Plaintiffs' theory is that Superior directed all actions of Superior Trading and that Superior Trading was a participant in Superior's actions.

Defendants have now filed this motion, which is in four parts: 1) they claim that this controversy should be litigated in Indiana pursuant to a forum selection clause, 2) they allege that this Court does not have personal jurisdiction, 3) they contend that venue is improper in this district, and 4) they ask that the action be transferred under 28 U.S.C. § 1404(a).

## THE FORUM CLAUSE

■ Defendants first argue that this lawsuit should be transferred to Indiana on the ground that the parties have contracted to litigate this dispute in that forum. The purported forum selection clause, contained in the June agreement, states:

> [T]he undersigned [plaintiffs] hereby consent that any actions brought by Superior hereunder and by reason of this Guaranty, may be brought in any state or federal court in Allen County, Indiana, and the undersigned hereby consent to such jurisdiction and agree that they will enter and defend any such action without interposing as a defense the lack of personal jurisdiction over the undersigned in Indiana.

In the Court's opinion, the clause is not a forum selection clause and is not a significant factor in favor of transferring this case to Indiana under 28 U.S.C. § 1404(a), discussed below.

The clause by its own terms covers only actions brought by Superior. This action was brought by Norval and the Valenes. Defendants drafted the clause, but did not specify that all actions arising under or out of the June agreement had to be litigated in Indiana, which is the language the typical forum selection clause contains. *See Kline v. Kawai America Corp.*, 498 F.Supp. 868, 870 (D.Minn.1980). Instead, the apparent purpose of the clause is to have Norval waive a personal jurisdiction defense.

Also, Count VI of plaintiff's complaint clearly is not covered by the clause. Count VI alleges that defendants breached a contract to purchase a half interest in Federal. This claim has no apparent link to the June 1978 agreement. Therefore, if Count VI is to be litigated here, it would be anomalous to construe the provision as a forum selection clause which would require the other counts to be transferred to Indiana.

Finally, plaintiffs claim that the June 1978 agreement, and other agreements referred to in the complaint, were exacted through fraud and duress. Assuming that the clause is a forum selection clause, one factor to be considered in applying the "reasonableness test" this Court embraced in *Kline v. Kawai America Corp.* is "whether the provision was equally bargained for." 498 F.Supp. at 872. Plaintiffs' verified complaint alleges that the agreements between Norval and defendants were not equally bargained for and should not be enforced on unconscionability grounds.

In light of all of the foregoing considerations, the Court cannot assign any significant weight to the clause in determining whether this case should be transferred.

## PERSONAL JURISDICTION

■ The basic question with respect to personal jurisdiction is whether defendants had sufficient minimum contacts to assure

that the assertion of Minnesota jurisdiction does not violate due process. *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945).

In assessing defendants' contacts, the Court must, for the purposes of this motion, take as true plaintiffs' allegations that Superior and Superior Trading are essentially one and the same and that a contact by one is a contact by the other. Allegedly officers of Norval were led to believe that there was little or no distinction between the two entities. Harkess Aff. ¶ 11. The two corporations share a number of the same officers; Leonard Rifkin is president of both companies. According to the affidavit of Louis Gershman, at ¶¶ 10–12, persons involved in the scrap metal business drew no distinction between the two corporations.

Upon consideration of all of the affidavits and interrogatory answers, the Court concludes that both Superior and Superior Trading had sufficient minimum contacts with Minnesota. The Court finds especially persuasive several contacts related to the negotiation and implementation of the agreements at issue. *Cf. Toro Co. v. Ballas Liquidating Co.*, 572 F.2d 1267, 1270–71 (8th Cir. 1978).

One key contact was a trip to Minnesota made by Leonard Rifkin and others in 1978 to negotiate the April agreement. As John Valene states in his affidavit, at ¶ 8:

Defendants likewise sent their president and his father, along with their accountant and controller and attorney, to Minnesota on business related to Federal Copper, Norval and the undersigned personally. The undersigned met with Mr. Robert Wiley [sic] on March 27, 1978, and April 4, 1978. In both meetings, the specifics of the acquisition by defendants of part ownership of Federal Copper; the assets and operations of Federal Copper and Norval; and Federal Copper's computer-based accounting system were discussed and scrutinized. The April 4, 1978 meeting specifically involved extensive discussions and negotiations involving Mr. Leonard Rifkin, defendants' president, Mr. Wiley, and Mr. Harkess, the principals' accountants and controllers, Mr. Joseph Bard, attorney for Norval and Federal Copper, the undersigned, and various other Federal Copper and Norval employees. The meeting lasted the better part of the day, was arranged following an offer from defendants in March, and subsequently lead [sic] to the April 18, 1978 letter of intent from defendants' president and the takeover by defendants of the management and operations of Federal Copper's Pulaski facility.

Mr. Valene's statements are supported by the affidavit of Leslie Harkess, at ¶ 9:

Contrary to the statements of Mr. Willey in his Affidavit of January 9, 1981, paragraph 7, and of Mr. Leonard Rifkin in his Affidavit of January 9, 1981, paragraph 14, discussions and conferences between the undersigned, at various times, Mr. John Valene, Mr. Willey and Mr. Leonard Rifkin consumed several hours, did focus at various times on the contractual arrangement as defined in defendants' letter of intent, executed a few days later on April 18, 1978, and was consistent with the high level of personnel involved in the discussions: executive officers, owners and chief accounting personnel.

Several other contacts related to plaintiffs' causes of action are also significant.

1) Accountants employed by the defendants audited and examined Federal books in Minneapolis. Valene Aff. ¶ 7.

2) Minnesota real property was pledged as security for the various agreements. Valene Aff. ¶ 9.

3) Numerous telephone conversations, many initiated by the defendants, concerning all of the transactions at issue occurred. Naturally, telephone conversations and mail exchanges are alone not enough for the assertion of personal jurisdiction, but the Minnesota Supreme Court has recognized that they are entitled to some weight in light of the fact that modern business is usually transacted by mail and telephone. *Marquette National Bank of Minneapolis v. Norris*, 270 N.W.2d 290, 295 (Minn.1978).

Finally, defendants had a number of contacts with Minnesota that are less directly related to plaintiffs' claims, including the purchase of scrap metal from Minnesota corporations for sale to Federal, the solicitation of business in Minnesota, certain sales in this state to Minnesota buyers, and contacts relating to the equipment and tools business.

All of the facts and circumstances constitute an ample basis for the Court's assertion of jurisdiction over defendants' persons.

## VENUE

■ Under 28 U.S.C. § 1391(a), a diversity case may "be brought only in the judicial district where all plaintiffs or all defendants reside, or in which the claim arose." 28 U.S.C. § 1391(c) provides that a corporation's residence includes where it is "doing business." Defendants contend that they do not do business in Minnesota, and that the claim did not arise here.

In assessing both of these venue issues, it is well to remember that "[s]ince venue is a procedural rule of convenience, the convenience of the aggrieved party should be first accommodated." *Gardner Engineering Corp. v. Page Engineering Co.*, 484 F.2d 27, 33 (8th Cir. 1973).

With respect to the "doing business" standard, a finding that the Court has personal jurisdiction over the defendants is strong evidence that the defendants have done business in Minnesota. As noted in *Munsingwear, Inc. v. Damon Coats, Inc.*, 449 F.Supp. 532, 537 (D.Minn.1978), "[t]he facts that establish personal jurisdiction over defendant in Minnesota also tend to establish that it has been doing business in Minnesota for venue purposes." In this case, defendants' numerous and substantial contacts with Minnesota and Minnesota companies realistically amounted to doing business in Minnesota.

In light of the fact that defendants did business in Minnesota, it is at this time unnecessary for the Court to determine whether a substantial part of the events or omissions giving rise to plaintiffs' claims occurred here.

## TRANSFER UNDER § 1404(a)

■ 28 U.S.C. § 1404(a) provides that:

For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

The party bringing a motion to transfer under § 1404(a) must make "a clear showing that the action should be transferred." *Medtronic, Inc. v. American Optical Corp.*, 337 F.Supp. 490, 495 (D.Minn.1971).

In this case, the affidavits and arguments indicate that this forum is most convenient for the plaintiffs and Indiana is most convenient for the defendants. Defendants have not shown that Indiana would be more convenient for third-party witnesses. Under these circumstances, the transfer motion must be denied:

A motion to transfer will not be granted if it merely shifts inconvenience from one party to the other. Plaintiff's choice of forum is entitled to deference, and it is defendants' burden to show that another court would better accommodate the parties, witnesses, and interests of justice.

*Stinnett v. Third National Bank of Hampden County*, 443 F.Supp. 1014, 1017 (D.Minn.1978).

The one factor identified by the defendants that causes the Court some concern is the health situation of the wife of defendants' chief executive officer, Leonard Rifkin. However, plaintiffs state in their brief, at 3–4, that "plaintiffs have consented to four continuances and will continue to make all reasonable and necessary accommodations, short of abrogating all their legal rights." The Court expects that plaintiffs will cooperate with defendants to insure that this litigation does not conflict with the personal needs of Mr. Rifkin as they relate to his wife.

## ORDER

Accordingly,

IT IS ORDERED that defendants' motions to dismiss or transfer this case to the United States District Court for the North-

ern District of Indiana, Fort Wayne Division, be and hereby are denied.