**GARDNER ENGINEERING CORPO-RATION et al., Appellees,**

**v.**

**PAGE ENGINEERING COMPANY, Appellant.**

**No. 72–1771.**

United States Court of Appeals, Eighth Circuit.

Submitted May 14, 1973.

Decided Aug. 1, 1973.

Henry Woods, McMath, Leatherman & Woods, Little Rock, Ark., and Harry H.

Ruskin, Ruskin & Rosenbaum, Chicago, Ill., for appellant.

Martin G. Gilbert, Coleman, Gantt, Ramsay & Cox, Pine Bluff, Ark., for appellees.

Before GIBSON, HEANEY and ROSS, Circuit Judges.

GIBSON, Circuit Judge.

This diversity suit on an anticipatory repudiation of a contract, between a prime contractor and a subcontractor, was brought in the Eastern District of Arkansas. The District Court[1] in a jury waived trial found for the plaintiffs in the amount of $91,423.46. We affirm the judgment of the District Court.

Because jurisdiction and venue are challenged a brief description of the parties is mandated. Plaintiffs are: (1) M. Clare Miller, C. Dale Miller, and Lloyd W. Miller, a Kansas partnership operating under the name of San Ore Construction Company; (2) Gardner Engineering Corporation, a Texas corporation; subsequently added as plaintiffs were (3) Miller Bros. Inc., a Kansas corporation; and (4) Geco, Inc., a Texas corporation. Original plaintiffs had formed a joint venture, S.O.G.—San Ore-Gardner, for the purpose of bidding on alterations on the Benzal railroad bridge[2] spanning the White River near Benzal, Arkansas. Defendant Page Engineering Company, an Illinois corporation, had its principal place of business in Illinois. None of the original parties had qualified to do business in Arkansas, but Geco, Inc. was qualified to do business in Arkansas. The plaintiffs hereafter will be collectively referred to as S.O.G. Plaintiffs for the most part are engaged in the heavy construction business; the defendant in manufacturing.

In July 1968, S.O.G. sent out invitations for bids from its Pine Bluff, Arkansas, office to various subcontractors including Page, while apparently at the

1. The Honorable Oren Harris presiding.

2. Substantial changes were projected in altering the existing swing-span bridge into a lift-span bridge.

same time Page had sent notices that it was preparing a bid to all general contractors interested in the project, including S.O.G. This notice was sent to the Pine Bluff, Arkansas, office of S.O.G. Page's notice apparently was not in response to S.O.G.'s invitation but was offered at Page's initiative. Thereafter, in August, 1968, Page delivered to a representative of S.O.G. in St. Louis, Missouri, Page's proposal for furnishing all of the required cast steel, operating machinery, sheaves, trunnions, trunnion bearings, wire rope and attachments. Bids were opened in St. Louis in August, 1969. S.O.G. was awarded the primary contract. Subsequently, in December, 1968, S.O.G. from its office in Houston, Texas, sent to Page in McCook, Illinois, a purchase order for three of the items on Page's proposal, omitting the cast steel, at the item bid cost of $205,964. All of these materials and equipment were to be delivered to the jobsite in Arkansas and Page was to furnish a field engineer to supervise construction and start up the machinery. All invoices were to be sent to S.O.G. in Houston, Texas. On December 17, 1968, Page at its office in Illinois signed the acceptance copy of the purchase order "Subject to Ltr. 12–17–68 Attached" and returned the acceptance copy and letter to S.O.G. in Houston, Texas.

Page's attached letter objected to the delivery terms of the purchase order "to fit contractor's schedule" and requested that S.O.G. "provide us by return mail a delivery schedule of each of the items required for this order. . . . " On January 6, 1969, Page again requested of S.O.G. a definite shipping schedule of the equipment and materials to be furnished. S.O.G. replied on January 9, 1969, that "[w]e intend to give you a schedule for delivery of equipment. . . . However at this time a work order had not been issued by the railroad . . . it is anticipated that the need for the machinery will come in the winter of 1970. I will advise you from time to time as the schedule gets more definable."

Page again wrote S.O.G. on March 23, 1969, stating in part that the purchase order could not be released for procurement and production until "a more specific shipment schedule can be established." S.O.G. replied on April 2, 1969, that it was setting delivery of all machinery for July 15, 1970. Page being unable to relate the July 15, 1970, date to the original intention of "winter of 1970" and expressing concern about the absence of an exact shipment sequence wrote S.O.G. on April 10, 1969, stating in part " . . . it presently appears that this required delivery date of July 15, 1970 may be critical for us and request that you keep us closely advised of actual required delivery date for each major element or component to be furnished by us."

Page contends that their understanding of the phrase, "winter of 1970," contained in the letter from S.O.G. dated January 9, 1969, was that delivery would begin about December, 1970, and that this earlier date would not be satisfactory. A series of letters between the parties concerning the delivery date ensued. The next significant letter was from Page to S.O.G. under date of June 10, 1969. It read in pertinent part:

"Unless we have advice from you with reasonable dispatch confirming delivery for the winter beginning December 1970, we shall be compelled to regard your April 2 letter, which sets up the July 15, 1970 date, as a material change in the understanding between us and as making it impossible to have a binding agreement between us."

In the meantime, government fund shortages had caused the proposed substructure work on the bridge to be delayed. S.O.G. communicated this fact to Page and further told Page, by letter dated July 8, 1969, that:

"Due to uncertainty of available funds from the government for the new fiscal year, the railroad company has suggested we delay substructure work. Delivery of the materials cov·

ered by reference purchase order in December, 1970 to January, 1971 is now considered· satisfactory. Due to jobsite handling conditions we will want all materials delivered at the same time. Please schedule your delivery accordingly."

After further negotiations between the parties, and their attorneys, Page notified S.O.G. by letter of November 13, 1969, that it had canceled the contract. This lawsuit ensued.

Despite all of the controversy on the projected and actual delivery date desired, Page must have known that construction progress was dependent on a number of factors, including government financing, river stages, and the necessary coordination between suppliers of materials and equipment together with the work force needed in the step by step process of carrying out this project. Page requested and was entitled to a tentative schedule of the delivery date insofar as it affected its operation in order to effectively utilize its facilities and work force; and a tentative schedule was received. Finally, after all of the letters respecting possible or intended delivery dates were exchanged and after Page said it would not deliver prior to December, 1970, S.O.G. agreed in its letter of July 8, 1969, that delivery in December, 1970 to January, 1971 would be satisfactory. Meanwhile Page had taken no steps to fabricate and manufacture the items of its subcontract, and when Page's revised calculations indicated an anticipatory loss of $110,000 if it performed the subcontract, Page canceled on November 13, 1969. Upon Page's cancellation, S.O.G. re-submitted the item for bids. The accepted bid exceeded Page's original bid by $91,423.46, the amount awarded in judgment by the trial court.

Page raises five issues on appeal: (1) lack of personal jurisdiction over Page, (2) improper venue, (3) no contract existed between the parties, (4) S.O.G. had given Page cause to be insecure regarding payment, and (5) S.O.G. failed to act in good faith toward Page. We examine each issue seriatim.

■ *Jurisdiction:* Jurisdiction in this case is based on Ark.Stat.Ann. § 27–2502 (1971 Supp.). This statute provides in pertinent part:

"27–2502. Bases of personal jurisdiction over persons outside this state.—

\* \* \* \* \* \*

"C. Personal jurisdiction based on conduct.

"1. A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a (cause of action) (claim for relief) arising from the person's

\* \* \* \* \* \*

"(b) contracting to supply services or things in this State . . . ."

There is no real dispute that the activities of the defendant fall within the terms of the statute. The question raised by Page is whether or not, under the facts of this case, there is the minimum contact with the State of Arkansas necessary to satisfy Fourteenth Amendment due process requirements on personal jurisdiction. We think there is.

The operative facts are undisputed. Neither the original plaintiffs nor the defendant are residents of the State of Arkansas or qualified to do business there. Defendant agreed to supply custom fabricated items, intended solely for use in the State of Arkansas, by delivery FOB jobsite and also agreed to furnish a field engineer to oversee installation and start up of the machinery.

■ Likewise, the broad legal principles are not in dispute. Both parties cite the leading Supreme Court decisions on this issue. Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L. Ed.2d 223 (1957); International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). These decisions establish the broad framework within which the lower federal courts must operate. Ultimately

each question of jurisdiction must be decided on a case-by-case basis. Velandra v. Regie Nationale des Usines Renault, 336 F.2d 292, 295 (6th Cir. 1964). International Shoe Co. v. State of Washington, *supra* at 316, at 158 of 66 S.Ct. holds that:

". . . due process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts, with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' "

Narrowing this concept of minimum contacts, the Court held that it involves a lesser degree of activity than that referred to as "doing business" within a state. McGee v. International Life Ins. Co., *supra* at 222, 78 S.Ct. at 200. Also, the Court said: "It is sufficient for purposes of due process that the suit was based on a contract which had substantial connection with [the forum] State." *McGee, supra* at 223, 78 S.Ct. at 201.[3]

The question here is whether the promise of performance of this customized contract obligation within the forum state provided a substantial connection with that state. We think it did.

■ Initially, it should be noted that it is immaterial that the contract in question may have had significant connections with states other than the forum state. Plaintiff is not required to choose the forum with the most significant contacts as a matter of jurisdiction (although that factor might be significant in choice of law questions).

In Aftanase v. Economy Baler Co., 343 F.2d 187 (8th Cir. 1965), Judge Blackmun (now Mr. Justice Blackmun), after an analysis of the leading Supreme Court decisions in this area,[4] made this observation:

"We also think it is fair to say that these five Supreme Court cases establish only general and not precise guidelines. Perhaps they purposely do no more than this. We observe, however, that, at one time or another in the opinions, three primary factors, namely, the quantity of the contacts, the nature and quality of the contacts, and the source and connection of the cause of action with those contacts, are stressed, and that two others, interest of the forum state and convenience, receive mention." 343 F.2d at 197.

These same factors have been cited in Thompson v. Ecological Science Corp., 421 F.2d 467 (8th Cir. 1970); and Electro-Craft Corp. v. Maxwell Electronics Corp., 417 F.2d 365 (8th Cir. 1969).

■ Unfortunately the weight to be given to each factor cannot be measured with mathematical precision and the ultimate determination is the result of considerable subjective balancing. However, not all five of these factors need be present to support personal jurisdiction. *Aftanase, supra* at 197. In some situations one factor alone would suffice, *i. e.* a tort committed in driving

3. Appellant Page, relying on L. D. Reeder Contractors of Ariz. v. Higgins Industries, Inc., 265 F.2d 768 (9th Cir. 1959), would have us adopt a rule based on the defendant's activities within the forum state. *McGee* clearly refutes this position for contract cases, focusing not on defendant's total activities within the forum state but on the relation of the contract to the forum state. While *Reeder* contains language supporting Page's argument, decisions have relevancy to factual situations of like kind and should not be strained to cover an inapposite situation of a contractual agreement to be performed in the forum state. *Reeder* recognizes the ultimate question as one of "reasonableness".

4. International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L. Ed. 95 (1945); Travelers Health Ass'n v. Virginia, 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154 (1950); Perkins v. Benguet Consol. Mining Co., 342 U.S. 437, 72 S. Ct. 413, 96 L.Ed. 485 (1952); McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); and Hanson v. Denckla, 357 U.S. 235, 780 S.Ct. 1228, 2 L.Ed.2d 1283 (1958).

an automobile in the forum state or as in *McGee,* the renewal of an insurance policy.

With regard to the first factor, the quantity of the contacts, we find there are three. The initial letter of S.O.G. came from Arkansas to the defendant. S.O.G. had established a base of operations in Arkansas for processing contracts in the state with a value in excess of eight million dollars. Defendant's first letter stating interest in bidding on the project was sent to Arkansas. The contract was to be performed in Arkansas by delivery of specially designed machinery and equipment to the jobsite there and by furnishing a supervisor for the installation of those items.

We next look to the "nature and quality" of these contacts. These terms as used in prior cases, unlike the term "quantity", have a rather nebulous meaning, and further refinement of their meanings seem appropriate. The term "nature" has apparently been used to refer to the directness of the contact with the forum state, an attempt to determine if the party, by his affirmative action, has "invoked the benefit and protection of [the forum's] laws and could reasonably have anticipated that its act would have consequences in [the forum state]." Electro-Craft Corp. v. Maxwell Electronics Corp., *supra.* The term "quality" appears to have been used to refer to the relative importance of the contact to the whole transaction between the parties. See, Thompson v. Ecological Science Corp., *supra* (where it was considered significant that all negotiations leading to the formation of a contract had taken place within the forum state even though the execution had been outside the state). In this regard it is apparent that the place of performance of a customized contract of this type is a contact of such quality as to support jurisdiction. Likewise, where the negotiations leading to a contract are initiated by a letter from the forum state or by a letter directed to the forum state, the nature of the contacts cannot be deemed to be insignificant.

Finally, the third of the primary factors is present in this case. The cause of action is directly related to the contact of the place of performance and arises from that contact by the failure of performance (even though by repudiation).

As to the secondary factors, the interest of the forum state in the performance of contracts within its jurisdiction is obvious, and the defendant does not argue that it is onerously inconvenient for it to defend this suit within the Eastern District of Arkansas. It could not with good grace do so, having previously agreed to supply specially designed machinery and equipment to be installed in Arkansas under its supervision.

The District Court was correct in determining that it had jurisdiction.

■ *Venue*: Page contends that the District Court erred in finding venue proper in the Eastern District of Arkansas. Venue in this case is based on 28 U.S.C. § 1391(a) which provides:

"A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in the judicial district where all plaintiffs or all defendants reside, or in which the claim arose."

In this case the venue must be based on the clause which provides for venue in the judicial district in which the claim arose; the other parts of the subsection are clearly inapplicable. This portion of the statute was added in 1966.

Page would have us reject the concept of place of performance in this case because the action was founded on an anticipatory breach of repudiation. It is Page's contention that since the repudiation was made in Illinois, the action arose in Illinois.

The Restatement of Contracts, § 321 (1932) states:

"§ 321. When Repudiation by Mail or Telegraph Becomes a Breach.

"Statements of repudiation in a letter mailed or a telegram sent to a

promissee or other person having a right under a contract which if made orally would be a breach of contract constitute. a breach as of the time when and the place where the letter or telegram is despatched."

See, Karson Industries, Inc. v. Superior Court of Contra Costa County, 273 Cal. App.2d 7, 77 Cal.Rptr. 714, 716 (1969). We feel, however, that this is too narrow a view to take for purposes of federal venue in the light of the great expansion in interstate commercial dealings in the period since the adoption of this section of the Restatement.

The House Report on the 1966 Amendment to § 1391 stated: "This *enlargement* of venue authority will facilitate the disposition of both contract and tort claims by providing, in appropriate cases, a *more convenient forum* to the litigants and the witnesses involved." 1966 U.S.Code Cong. & Admin.News, p. 3694 (1966) (emphasis added).

■ While there is very little law on this precise issue, the pertinent cases found venue at the place of performance would be proper. Deering Milliken Research Corp. v. Textured Fibres, Inc., 310 F.Supp. 491, 500 (S.C.1970); Ryan v. Glenn, 52 F.R.D. 185 (N.D.Miss. 1971). Since venue is a procedural rule of convenience, the convenience of the aggrieved party should be first accommodated. The court is always open to a motion based on *forum non conveniens* to be raised by the other party. 28 U. S.C. § 1404.

This enlargement of the venue rules must necessarily recognize that whenever a large business entity thrusts itself into a business transaction far from its corporate home that it may well subject itself to the defense of suits in that new jurisdiction. This should work no great hardship on the corporate defendant for, as recognized by Professor Wright, modern means of transportation minimize the inconvenience in going to another district to litigate. Wright, Law of Federal Courts, 151 (1970). Further, as noted by Professor Wright,

the American Law Institute would determine the district in which the claim arose by allowing suit in the district in which a substantial part of the omissions giving rise to the claim occurred. Wright, *supra* at 152, n. 23. This presumably would be in the district where defendant omitted to perform his contract. Thus, for the purposes of determining federal venue, we must reject the restrictive provisions of the Restatement of Contracts in determining the place where the action arose in favor of a broader test more in tune with the modern business world.

It clearly appears to be the purpose of the 1966 amendment to § 1391(a) to further the convenience of the parties, the primary purpose of the venue statutes, and to allow a suit to be brought at the place where the claim arose, which could include the place where the performance was to have taken place. The place of performance here was at the jobsite in Arkansas, and it clearly meets both the spirit and intent of the amended venue statute to hold that venue was proper in Arkansas.

Venue at the place of repudiation, as argued by Page, would often result only in convenience to the repudiator and not the aggrieved party. Also, to limit the venue to the place of repudiation, in preference to the place of performance, would allow the repudiator by his own wrongful act to limit the forum available to the aggrieved party. Such unjust results should be rejected unless commanded by applicable statutes. It is our opinion that the federal statute, § 1391(a) as amended, does not command this result; but is intended to expand the venue statute by placing venue, in addition to the residency of the parties, at the place where the cause of action arose, which can be construed in this case as the place where performance was to have taken place.

■ *The Existence of a Contract:* Page contends that no contract came into existence because the delivery date question was not resolved. First, Page's acceptance of the order appears to be

unqualified; the letter is merely a request for the offeror's best estimate of the date that delivery would be required. There was no indication that the date was material to the contract, only that for the understandable convenience of Page and for the benefit of both parties in programing production, this information was needed. Even if no contract was created at that time because there was no "meeting of minds" on the delivery date, the parties did finally agree on the delivery date demanded by Page, December, 1970, and a contract was obviously created at the time of that agreement. The argument that Page requested a delivery schedule and that S.O.G. responded with a delivery date and thus no contract was formed is too simplistic and ignores the realities of the construction industry and the ultimate agreement on a satisfactory delivery date.

■ *Grounds for Insecurity*: Page contends that the letter of July 8 from S.O.G. gave it grounds for insecurity. Under U.C.C. § 2–609, a party having reasonable grounds for insecurity may demand assurance of performance from the other party. First, we must point out, as did the District Court, that the contract obligated S.O.G. to pay for the materials whether it received government funds or not. Nevertheless, assuming that Page did have apprehensions (whether reasonable or not), concerning payment in the event that government funds were not available, the record discloses that Page's attorney, in a conference with the attorney for S.O.G., was told that S.O.G. paid its suppliers whether the government funds had been received or not. No other assurances were demanded.

■ *Cooperation and Good Faith*: We have examined the record regarding the dealings between the parties and affirm Judge Harris's finding that S.O.G. at all times fulfilled both the letter and the spirit of the U.C.C. requirements of cooperation and good faith. U.C.C. §§ 1–203, 2–311.

The judgment is affirmed.