# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### January 8, 2019 Session

## CROUCH RAILWAY CONSULTING, LLC v. LS ENERGY FABRICATION, LLC

**Appeal from the Chancery Court for Williamson County**
**No. 45854      Joseph A. Woodruff, Chancellor**

_____

### No. M2017-02540-COA-R3-CV

_____

The sole issue on appeal is whether a Tennessee court may exercise specific personal jurisdiction over the nonresident defendant. A Tennessee civil engineering company filed an action for breach of contract and unjust enrichment against a Texas energy company in Williamson County Chancery Court, alleging that the Texas company breached its contract with the Tennessee company by failing to pay for engineering and planning services. The defendant filed a Tenn. R. Civ. P. 12.02(2) motion to dismiss for lack of personal jurisdiction. The trial court granted the motion, determining that the minimum contacts test had not been satisfied because the defendant did not target Tennessee. Additionally, the trial court determined that it would be unfair and unreasonable to require the defendant to litigate the dispute in Tennessee. This appeal followed. Relying primarily on the Tennessee Supreme Court's reasoning in *Nicholstone Book Bindery, Inc. v. Chelsea House Publishers*, 621 S.W.2d 560 (Tenn. 1981), we have determined that the Texas company purposefully directed its activity toward Tennessee by engaging a Tennessee engineering company to provide customized services, which were performed primarily in Tennessee. We have also determined that it is fair and reasonable to require the Texas company to litigate the dispute in Tennessee. Therefore, we reverse the trial court's decision to dismiss for lack of personal jurisdiction and remand for further proceedings.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

M. Clark Spoden and Payton M. Bradford, Nashville, Tennessee, for the appellant, Crouch Railway Consulting, LLC.

Emily Hamm Huseth, Memphis, Tennessee, and Benjamin D. West, Oxford, Mississippi, for the appellee, LS Energy Fabrication, LLC.

## OPINION

The plaintiff, Crouch Railway Consulting, LLC ("Crouch"), is a civil engineering company, specializing in railway engineering and consulting services, with its principal place of business in Brentwood, Tennessee. The defendant, LS Energy Fabrication, LLC d/b/a Lonestar Energy Fabrication ("Lonestar") is an energy company, with its principal place of business in Baytown, Texas.[1]

On January 12, 2016, representatives from Crouch met with representatives from Lonestar in Texas to offer Crouch's engineering and planning services related to the construction of a railcar repair facility in Texas. On January 15, after returning to Tennessee, Scott Vick, Senior Project Manager for Crouch, sent a proposed contract to Brian Shanklin at Lonestar. The proposed contract stated that Crouch would provide preliminary consulting, planning, and engineering services to Lonestar for the construction of its railcar facility at a cost of $55,450. It also included Crouch's resume, which identified Crouch as a limited liability company located in Brentwood, Tennessee, and licensed to provide engineering services in 48 states. After reviewing the contract, Mr. Shanklin signed it and then sent it to Crouch in Tennessee, at which time Crouch commenced rendering its services.[2]

Aside from four site visits to Texas, nearly all of Crouch's engineering and planning services were performed from Crouch's offices in Brentwood, Tennessee. The customized services provided by Crouch included, *inter alia*, preliminary planning and engineering for the railcar operation; a civil site drawing related to site grading, drainage, access roads, utilities, track layout, and new track construction; a detailed cost estimate for the railroad design; and preparation of a timeline for project completion.

Throughout the project and while Crouch employees worked from their offices in Tennessee, Crouch and Lonestar exchanged emails concerning Crouch's performance under the contract, which included (1) an email from Lonestar to Crouch containing the dimensions of metal buildings to use in determining the size of the railcar repair facility;

---

[1] Because this case was dismissed by the trial court upon Lonestar's motion under Tennessee Rule of Civil Procedure 12.02(2), our sources of the relevant facts are the Complaint and the affidavits and exhibits submitted by the parties. Here, we assume that Crouch's allegations are true and resolve all factual disputes in its favor, unless they are "controverted by more reliable evidence and plainly lack credibility." *See State v. NV Sumatra Tobacco Trading Co.*, 403 S.W.3d 726, 735 (Tenn. 2013). The procedural history is taken from the record provided by the trial court.

[2] The contract did not contain a forum selection clause or a choice of law provision.

(2) acknowledgement from Lonestar of receipt of the Preliminary Planning and Engineering Report sent to them from Crouch; and (3) correspondence between Crouch and Lonestar regarding changes to the shop layout.

Crouch sent Lonestar progress reports and invoices for work completed in January, February, and March 2016. In response, Lonestar mailed payment for January, which Crouch then deposited in its bank in Tennessee. But, Lonestar failed to pay for the work done in February and March. Therefore, Crouch sent Lonestar a number of emails inquiring about the status of payment, and in an email response, Lonestar assured Crouch that payment was forthcoming. By January 2017, Lonestar still had not paid as promised, and on January 13, 2017, Crouch filed an action against Lonestar for breach of contract and unjust enrichment in Williamson County Chancery Court.

Lonestar responded by filing a Rule 12.02(2) motion to dismiss for lack of personal jurisdiction. Lonestar argued that because it was not registered to do business in Tennessee, had no employees in Tennessee, and did not solicit business in Tennessee, Lonestar's contacts with Tennessee were insufficient for personal jurisdiction. More specifically, Lonestar contended that Crouch targeted and solicited Lonestar in Texas regarding Crouch's desire to work on the project, and all meetings and professional services rendered pursuant to the contract were performed in Texas. Though Lonestar conceded that it knew at all times that Crouch was a Tennessee company, it argued that contracting with a Tennessee company, alone, was not enough to confer jurisdiction on a Tennessee court.

In its memorandum in support of its motion to dismiss, Lonestar principally relied on the following facts:

1. Lonestar is a Texas limited liability company with its principal place of business in Baytown, Texas.
2. Lonestar is in the business of fabricating oilfield components, offshore rigs, and offshore quarters buildings through the Gulf Coast regions.
3. Lonestar is not registered to do business in Tennessee, and has no registered agent in Tennessee.
4. Crouch is a Tennessee limited liability company with its principal place of business in Brentwood, Tennessee. Crouch is registered to do business in Texas.
5. The Contract at issue resulted from a meeting held at Lonestar's facility in Baytown, Texas.
6. All work performed under the contract related to a railcar repair facility Lonestar wished to build in Baytown, Texas.
7. The Contract contemplated that Crouch would perform activities designed to advise Lonestar under Texas state law.

8. In order to provide professional engineering services in Texas, Crouch was required to have a Texas state engineering license.

9. Lonestar, through its employees and agents, never visited the State of Tennessee for any business purpose related to the Contract.

10. The contact between Lonestar and Crouch was initiated by Crouch when it reached out to Lonestar in Texas to make a proposal for the Contract.

11. All meetings relative to the Contract took place in Texas.

12. Lonestar has no property or operations in Tennessee.

13. Lonestar has never been a party to litigation in Tennessee.

14. None of the corporate officers of Lonestar reside in Tennessee.

15. No employees of Lonestar work or reside in Tennessee.

16. Lonestar does not routinely make purchases in Tennessee.

17. Lonestar does not direct any specific advertising to Tennessee.

18. Lonestar does not buy or purchase any materials from Tennessee on a systematic or continuous basis.

19. Lonestar does not routinely sell to customers who reside in or who have their principal place of business in Tennessee.

20. Lonestar, through its employees and agents, does not routinely visit the State of Tennessee for any business purpose.

In its response, Crouch countered that Lonestar had the minimum contacts necessary for specific personal jurisdiction, arguing that by engaging a Tennessee civil engineering firm to perform customized services in Tennessee, Lonestar purposefully availed itself of doing business in the state. And furthermore, by breaching its contract with a Tennessee company, Lonestar caused an injury in Tennessee, making it foreseeable that Lonestar would have to answer for its actions in a Tennessee court. Accordingly, Crouch contended that the cause of action arose directly out of Lonestar's contacts with Tennessee, and thus, the contacts were sufficient to subject Lonestar to specific personal jurisdiction in Tennessee.

In its memorandum in opposition to the motion to dismiss, Crouch relied on the following facts:

1. Lonestar entered into a contract with Crouch to provide consulting services to Lonestar for the design of a railcar repair facility ("Agreement").

2. The Agreement clearly demonstrates that Crouch was a consulting company located in Brentwood, Tennessee.

3. The cover page of the Agreement as well as the cover letter attached thereto both indicate clearly that Crouch was based in Brentwood, Tennessee.

4. Page 6 of Crouch's Agreement further states that Crouch is "located in Brentwood, TN."
5. Multiple documents Crouch sent to Lonestar pursuant to the Agreement reflected that Crouch was a Tennessee company performing services for Lonestar in Tennessee.
6. Further, Crouch performed nearly all of the work under the Agreement at its office in Brentwood, Tennessee. After the parties entered into the Agreement, Crouch prepared a preliminary Planning and Engineering Report out of its offices in Brentwood, Tennessee.
7. Crouch sent the Report to Lonestar from its offices in Brentwood, Tennessee, on March 8, 2016.
8. In addition to preparing the Report, Crouch performed the following work for Lonestar in Tennessee:

   • Preliminary planning and engineering to develop a safe, efficient facility plan for the Lonestar railcar repair operation;
   • Confirmation of the work process, identify process equipment required, and ensured the facility was properly sized;
   • Preparation of a detailed layout of the feeder track, transfer tables, and clean in place wash system;
   • Preparation of a civil site drawing related to site grading, drainage, access roads, utilities, track layout, and new track construction;
   • Preparation of a detailed cost estimate for the railroad design, complete repair process flow, railroad track work, rail construction, design and installation of the clean in place wash rack, and process equipment for budgeting purposes with 20% confidence;
   • Preparation of a timeline for project completion for design and construction.

9. Throughout the course of this work, Crouch and Lonestar representatives exchanged emails about the work performed pursuant to the Agreement between Tennessee and Texas.
10. The only work Crouch performed under the Agreement outside of Tennessee consisted of approximately four (4) on-site meetings between Lonestar and Crouch representatives that took place in Texas.
11. Beyond these meetings, no work for Lonestar was done outside Tennessee.

In August 2017, the trial court heard the motion and ordered the parties to submit supplemental briefs before rendering its decision. Then, on December 27, 2017, after

receiving the parties' supplemental briefs, the trial court entered an order dismissing the case for lack of personal jurisdiction. The court ruled:

> First, as to the quantity of the contacts, the Court finds Lonestar's contacts with the state of Tennessee to be trifling. Lonestar merely entered into a contract with a Tennessee limited liability company, communicated with that Tennessee limited liability company by email regarding a project in Texas, and submitted a payment for the services the Tennessee limited liability company completed on the construction project in Texas. Although [Crouch] performed preparatory and design work in Brentwood, Tennessee, these were not the actions of Lonestar submitting itself to the jurisdiction of Tennessee.

Furthermore, the court found it significant that Crouch was "a national company," licensed to do business in 48 states, and that Crouch initiated contact with Lonestar in Texas for a project to be completed in Texas. Therefore, the trial court found "the nature and quality of Lonestar's contacts with Tennessee to be trivial in general and especially so in comparison to [Crouch's] contacts with Texas." The court also determined that exercising personal jurisdiction over Lonestar in Tennessee would be unreasonable and unfair because many of the witnesses were located in Texas, Texas had a greater interest in the controversy, and it would be burdensome and "expensive" for Lonestar to litigate the dispute in Tennessee.

Crouch appealed, and asked this court to consider whether the trial court erred by dismissing its cause of action for lack of specific personal jurisdiction.

## STANDARD OF REVIEW

Motions to dismiss for lack of personal jurisdiction challenge the trial court's ability to proceed with the claims against a defendant. *Sumatra*, 403 S.W.3d at 739. Questions regarding personal jurisdiction must be raised and decided using the procedures applicable to Tenn. R. Civ. P. 12.02(2). *Id.* Unlike motions to dismiss for failure to state a claim, motions challenging personal jurisdiction are not converted into motions for summary judgment when one or both of the parties submit matters outside the pleadings. *Id.*

If a defendant challenges personal jurisdiction with affidavits, the plaintiff must respond with its own affidavits and, if useful, other written evidence. *Id.* In particularly complex cases, the trial court may decide to allow limited discovery, hold an evidentiary hearing, or hold the motion in abeyance pending a trial on the merits. *Id.* The court will assume that the nonmoving party's allegations are true and resolve all factual disputes in its favor. *Id.* However, courts are "not obligated to accept as true factual allegations . . . that are controverted by more reliable evidence and plainly lack credibility." *Id.* at 735.

The court must determine whether "the factual allegations in the plaintiff's complaint . . . establish sufficient contacts between the defendant and this state with reasonable particularity." *First Community Bank, N.A. v. First Tennessee Bank, N.A.*, 489 S.W.3d 369, 383 (Tenn. 2015). Dismissal is appropriate only when all "the specific facts alleged by the plaintiff collectively fail to establish a prima facie case for personal jurisdiction." *Sumatra*, 403 S.W.3d at 769 (quoting *Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d 635, 644 (Tenn. 2009)). Decisions regarding the exercise of personal jurisdiction over a defendant involve questions of law, which we review de novo without a presumption of correctness. *First Community Bank*, 489 S.W.3d at 382.

## ANALYSIS

The long-arm statutes enacted by the Tennessee General Assembly define the outer limits of a Tennessee court's ability to exercise jurisdiction over nonresident defendants.[3] *Sumatra*, 403 S.W.3d at 740. As our Supreme Court explained, "the broadly-phrased Tennessee long-arm statute is limited only by due process considerations as established in *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)." *Nicholstone*, 621 S.W.2d at 562.

These statutes allow Tennessee courts to assert personal jurisdiction "on any basis not inconsistent with the constitution of this state or of the United States." Tenn. Code Ann. § 20-2-225(2). The Due Process Clause of the Fourteenth Amendment to the United States Constitution permits a state to exercise jurisdiction over a nonresident defendant only when the defendant has such minimum contacts with the state that the exercise of jurisdiction does not "offend traditional notions of fair play and substantial justice."[4] *Sumatra*, 403 S.W.3d at 759 (citing *International Shoe*, 326 U.S. at 316.)

The due process requirements of the Tennessee Constitution are co-extensive with those of the United States Constitution. *Id.* at 741. Consequently, in personal jurisdiction cases, our courts "have generally hewn closely to the United States Supreme Court's precedents." *Id.* at 751. When determining whether the exercise of jurisdiction over the

---

[3] Tennessee's long-arm statute is comprised of three sections, Tenn. Code Ann. §§ 20-2-214, -223, and -225; however, the Tennessee Supreme Court has noted that § 223 is "narrower in scope" than the other two and "has largely fallen into disuse." *Sumatra*, 403 S.W.3d at 741, n.26.

[4] Courts recognize two types of personal jurisdiction—specific and general. *Sumatra*, 403 S.W.3d at 744 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)). "Specific jurisdiction exists when a defendant has minimum contacts with the forum state and the cause of action arises out of those contacts." *Id*. General jurisdiction exists "when the defendant is 'essentially at home' in the state." *Id*. (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). This case only concerns specific personal jurisdiction.

- 7 -

defendant comports with due process, Tennessee courts have adopted the two-part test employed by the United States Supreme Court in *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). *Id.* at 759.

The plaintiff must show that the defendant's contacts with the state support the court's exercise of jurisdiction. *Id.* at 759–60. The first step requires the court to focus on "the defendant, the forum, and the meaningful connections between them." *Id.* at 763. Accordingly, our examination should address **the quantity, nature, and quality of the defendant's contacts with Tennessee**. *Id.* at 759–60. The contacts between the defendant and the forum are sufficiently meaningful when they form a connection with the cause of action and demonstrate that the defendant has purposefully targeted the forum state in such a way that the defendant should reasonably anticipate having to litigate a dispute there. *Id.* at 760. Once the plaintiff has made the requisite showing, the burden then shifts to the defendant to prove that the exercise of jurisdiction would be unfair or unreasonable. *Id.*

## I. QUANTITY, NATURE, AND QUALITY OF CONTACTS WITH TENNESSEE

Crouch contends that Lonestar's contact with Tennessee was purposeful because, *inter alia,* (1) Lonestar knowingly engaged Crouch to perform customized engineering services from its offices in Tennessee; and (2) Lonestar exchanged a number of emails with Crouch in Tennessee to further customize Crouch's services under the contract. For its part, Lonestar argues that it did not target Tennessee because (1) Crouch solicited Lonestar in Texas to enter into the agreement; (2) the agreement concerned the construction of a facility in Texas; (3) the contract was short-term and did not contemplate continuing obligations in Tennessee, and (4) "[a]ny work Crouch did for Lonestar in Tennessee was done in Tennessee because Crouch unilaterally chose to do it there."

The case at bar presents facts that are substantially similar to those in *Nicholstone Book Bindery, Inc. v. Chelsea House Publishers*, 621 S.W.2d 560 (Tenn. 1981).[5] Moreover, the principal question presented in *Nicholstone* is the same here—"whether there are sufficient 'minimum contacts' to confer in personam long-arm jurisdiction over the defendant foreign corporation which has conducted a single business transaction with the plaintiff, a Tennessee corporation." *Id.* at 561.

---

[5] Because neither party addressed *Nicholstone* in their original briefs on appeal, at oral argument, we gave the parties an opportunity to submit supplemental briefs to discuss whether *Nicholstone* was distinguishable from the case at bar, and whether subsequent U.S. Supreme Court jurisprudence altered the analysis. Both parties filed supplemental briefs to address these issues.

In determining whether a short-term contract satisfied the minimum contacts test for specific personal jurisdiction, our Supreme Court noted that foreseeability was critical to the due process analysis, explaining that "the defendant's conduct and connection with the forum State [must be] such that he should reasonably anticipate being haled into court there." *Id.* at 564 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). More specific to the facts of this case, the Court found that it was foreseeable that the defendant would have to litigate a dispute in Tennessee when the "defendant entered into **an agreement which provided for a customized product including the manufacture of specialized goods**" in Tennessee. [6] *Id.* (emphasis added).

In discussing what facts and circumstances were relevant and material and what facts were not, the Supreme Court said "the determination of which party initiated the business transaction is irrelevant," and it was not material "that defendant did not solicit the business or that the contract was executed in the foreign state." *Id.* at 563 (citing *S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 382 (6th Cir. 1968)). Thus, contrary to Lonestar's arguments, it is of little consequence who initiated the discussions, where the contractual negotiations took place, or where the contract was executed. [7] *Id.* at 563 ("[T]echnicalities of the execution of the contract cannot change the business realities of the transaction."). Moreover, in determining whether the non-resident defendant "purposefully availed itself of the privilege of transacting business in Tennessee," the Court also found it "immaterial to the outcome" whether the defendant or its agent had a physical presence in Tennessee "for the transaction of business to serve as a minimum contact." *Id.*

What the *Nicholstone* court found significant, in fact "crucial," was that "the subsequent conduct of the defendant showed that it purposefully availed itself of the privilege of carrying on activities to secure goods from a manufacturer and seller located within the forum." *Id.* In this regard, the Court determined it was foreseeable that economic consequences would occur in Tennessee flowing from the business transaction because Tennessee was "the place of performance of a customized contract." *Id.* at 564 (citing *Gardner Engineering Corp. v. Page Engineering Co.*, 484 F.2d 27 (8th Cir. 1973)). Furthermore, the Court determined that Tennessee clearly had an interest in protecting its residents against a breach of contract by nonresidents for purchases made in

---

[6] The Court additionally noted that the services rendered in Tennessee included "the manufacture of specialized goods such as color plates, stamping dies, cover stock, from three other Tennessee companies and the purchase of specialized items such as paper, mailing cartons and vinyl pockets from two other Tennessee firms and a Kentucky firm." *Nicholstone*, 621 S.W.2d at 564.

[7] In *Nicholstone*, "[r]epresentatives of both parties met at a Booksellers Convention in Atlanta where they first discussed the possibility of plaintiff, Nicholstone, doing some business with defendant Chelsea House." *Id.* at 563.

the state, and it did not appear that a trial in Tennessee would be unfair or burdensome to the parties. *Id*. at 565–66.

When the Tennessee Supreme Court decided *Nicholstone*, there was a split of authority among both the federal and state courts in applying the minimum contacts test to a single business transaction.[8] *Id* at 565. After considering the differing views and holdings, our Supreme Court held that a crucial factor in determining purposeful availment "was the place of performance of a customized contract." *Id*. at 564 (citing *Gardner Engineering Corp.*, 484 F.2d at 32).

Four years after *Nicholstone*, the United States Supreme Court granted certiorari in its first personal jurisdiction case involving a breach of contract action since 1957.[9] *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). The Supreme Court acknowledged the disagreement in the lower courts and attempted to provide clarification, writing:

> At the outset, we note a continued division among lower courts respecting whether and to what extent a contract can constitute a "contact" for purposes of due process analysis. If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot. The Court long ago rejected the notion that personal jurisdiction might turn on "mechanical" tests, or on "conceptualistic…theories of the place of contracting or performance." Instead, we have emphasized the need for a "highly realistic" approach that recognizes that a "contract" is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which

---

[8] Justice White noted the disagreement when he dissented in the U.S. Supreme Court's denial of certiorari in a case similar to *Nicholstone*, stating,

> The disarray among federal and state courts…may well have a disruptive effect on commercial relations in which certainty of result is a prime objective. That disarray also strongly suggests that prior decisions of this Court offer no clear guidance on the question.

*Lakeside Bridge & Steel Co. v. Mountain State Constr. Co*., 597 F.2d 596, *cert. denied*, 445 U.S. 907, 911 (1980) (White, J., dissenting). Shortly following, Justice White wrote a dissent in the Court's denial of certiorari in *Nicholstone*, stating, "This case presents the same issue as *Lakeside*, and the disarray among federal and state courts noted in *Lakeside* has continued." *Nicholstone Book Bindery, Inc. v. Chelsea House Publishers*, 621 S.W.2d. 560, *cert. denied*, 455 U.S. 994 (1982) (White, J., dissenting).

[9] *McGee v. International Life Ins. Co*., 355 U.S. 220 (1957) is one of the Court's earliest applications of the minimum contacts test to a contract case.

themselves are the real object of the business transaction." It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum.

*Id*. at 478–79 (citations omitted).

While the place of performance of the contract was a critical factor in the Tennessee Supreme Court's decision in *Nicholstone,* its decision did not hinge on "'mechanical' tests" or "'conceptualistic…theories.'" *See id.* at 478. Rather, the Court considered (1) prior negotiations between the parties, which were allegedly initiated by the plaintiff in New York, but consisted of a number of communications by phone and by mail after the plaintiff returned to Tennessee, *Nicholstone*, 621 S.W.2d at 561; (2) contractual terms that called for customized printing and binding to be conducted in Tennessee, using custom products manufactured by other Tennessee companies, *id*. at 564; and (3) actual course of dealing, where the defendant dealt directly with at least one of the Tennessee subcontractors to change the color of the cover stock. *Id.*

Thus, *Burger King* did not alter the Tennessee Supreme Court's reasoning in *Nicholstone*.[10] Moreover, since *Burger King* was decided, Tennessee state and federal courts have continued to rely on *Nicholstone* to reach decisions in personal jurisdiction cases.[11] *See e.g. Wolff Ardis, P.C. v. Dailey*, No. W2013-01127-COA-R3-CV, 2013 WL 5613373, at *7 (Tenn. Ct. App. Oct. 11, 2013); *McMahan Jets, LLC v. Roadlink Transp., Inc*. 926 F. Supp. 2d 999, 1005 (W.D. Tenn. 2013); *Chase Cavett Servs., Inc. v. Brandon Apparel Grp., Inc*., No. 02A01-9803-CH-00055, 1998 WL 846708, at *5 (Tenn. Ct. App. Dec. 7, 1998). For the reasons stated above, we will analyze the facts of this case under the principles established in *Nicholstone* and *Burger King*.

In this case, the parties entered into a contract by which Crouch was to provide civil engineering services for the design of a railcar repair facility. The contract identified Crouch as a Tennessee company, and Lonestar concedes that it knew it was engaging a

---

[10]Unlike the short-term contract in *Nicholstone*, the franchise contract at issue in *Burger King* contemplated ongoing, long-term obligations in the forum state. *Burger King*, 471 U.S. at 480.

[11] Lonestar also contends that the 2014 U.S. Supreme Court decision in *Walden v. Fiore* changes the analysis and supports Lonestar's position that Lonestar's contacts are not sufficient for personal jurisdiction. 571 U.S. 277 (2014). We disagree. In *Walden*, the Nevada plaintiffs filed a *Bivens* action in a Nevada court against a Georgia defendant for alleged violations of their Fourth Amendment rights. *Id*. at 281. Because we find the factual situation in *Walden* to be completely inapposite to this case, the subsequent analysis offers minimal assistance.

Tennessee company to provide preliminary consulting, planning, and engineering services for Lonestar's construction project.

Although the facility was in Texas, the bulk of Crouch's services were performed from its offices in Brentwood, Tennessee, a fact that was known to Lonestar at all relevant times. As Crouch set forth in affidavits in its response in opposition to the motion to dismiss, Crouch's professional staff "prepared a preliminary Planning and Engineering Report out of its offices in Brentwood, Tennessee" and "performed nearly all of the work under the Agreement at its office in Brentwood, Tennessee." A more thorough description of the professional services Crouch provided from its office in Tennessee included:

1. Preliminary planning and engineering to develop a safe, efficient facility plan for the Lonestar railcar repair operation;
2. Confirmation of the work process, identify process equipment required, and ensured the facility was properly sized;
3. Preparation of a detailed layout of the feeder track, transfer tables, and clean in place wash system;
4. Preparation of a civil site drawing related to site grading, drainage, access roads, utilities, track layout, and new track construction;
5. Preparation of a detailed cost estimate for the railroad design, complete repair process flow, railroad track work, rail construction, design and installation of the clean in place wash rack, and process equipment for budgeting purposes with 20% confidence;
6. Preparation of a timeline for project completion for design and construction.

Additionally, Crouch contended that the only work Crouch performed under the Agreement outside Tennessee consisted of "approximately four (4) on-site meetings between Lonestar and Crouch representatives that took place in Texas," and "[b]eyond these meetings, no work for Lonestar was done outside Tennessee."

Lonestar counters, relying on the fact that its representatives never travelled to Tennessee, Crouch initiated contractual negotiations in Texas, and the contract was executed in Texas; therefore, Lonestar did not purposefully avail itself of doing business in Tennessee. However, as previously stated, *Nicholstone* tells us that these factors are not the most critical factors:

[T]he physical presence of the defendant or its agent in the forum state is "not necessary" for the transaction of business to serve as a minimum contact. Nor is it material that defendant did not solicit the business or that the contract was executed in the foreign state. Similarly, the determination of which party initiated the business transaction is irrelevant….**The crucial factor is that the subsequent conduct of the defendant shows that it purposefully availed itself of the privilege of carrying on activities to secure goods from a manufacturer and seller located within the forum**.

*Nicholstone*, 621 S.W.2d at 563 (citations omitted) (emphasis added). Thus, the most important factor is the subsequent conduct of the defendant, which requires the court to examine the contractual terms and the actual course of dealing between the parties. *See id.*; *see also Burger King*, 471 U.S. at 479. In that regard, Lonestar purposefully directed its activity toward Tennessee by entering into a contract with a Tennessee company pursuant to which the Tennessee company would provide customized services from its offices in Tennessee. *See id.*; *see also Burger King*, 471 U.S. at 479.

As for the contract itself, the terms were laid out in a 21-page document, which provided that Crouch would use its expertise to develop a railcar facility plan; create a preliminary engineering report; provide a cost estimate and timeline for the completion of the construction project; and coordinate and schedule all work for the construction phase, with the actual construction performed by Lonestar. To that end, the contract contemplated consistent communication between Crouch and Lonestar regarding Crouch's performance, stating:

[Lonestar] shall designate a person to act with authority on [its] behalf in respect to all aspects of the Project, shall examine and respond promptly to ENGINEER submissions, and shall give prompt written notice to the ENGINEER whenever he observes or otherwise becomes aware of any defect in or problem with the Project.

Therefore, unlike a contract for standard goods and services, which typically requires little, if any, communication between the parties, the customized contract here envisions more substantial and deliberate contacts with Tennessee. *See Nicholstone*, 621 S.W.2d at 564;[12] *see also Advanced Sec. Servs. Evaluation & Training, LLC v. OHR Partners Ltd.*, No. M2017-00249-COA-R3-CV, 2018 WL 1391626, at *8 (Tenn. Ct. App. Mar. 20, 2018) [*ASSET*]; *see also Wolff Ardis*, 2013 WL 5613373, at *6.

---

[12] The Court states, "It should be noted that one of the ingredients of jurisdiction missing in [*Darby v. Superior Supply Co.*, 458 S.W.2d 423 (Tenn. 1970)], the presence of a 'special manufacturing operation' is found in this case. These custom made bindings and casings were not simply taken from stock as was the lumber in *Darby*." *Id*. at 564.

Nevertheless, Lonestar argues that because the contract concerned a facility that would be constructed in Texas, the contract had a tenuous connection to Tennessee. We disagree. In a similar case, *Wolff Ardis*, the contract provided that a Memphis attorney would lend his expertise to a product liability action filed in Maryland. 2013 WL 5613373, at *1. Irrespective of where the litigation was filed, we determined that the non-resident defendant "purposefully directed his activity toward Tennessee" by engaging a Tennessee attorney to provide a specialized service to be performed in Tennessee.[13] *Id*. at *7. Thus, as in *Wolff Ardis*, the fact that the contract in this case concerned a facility to be constructed in a different state does not in any way diminish the contract's connection to Tennessee, which is the place where the actual services would be performed. *See Nicholstone*, 621 S.W.2d at 564.

As for Crouch's performance under the contract, aside from four site visits to Texas, Crouch did all of the work from its offices in Tennessee.[14] Moreover, throughout the process, Crouch emailed Lonestar progress updates from its offices in Brentwood, and Lonestar sent responses verifying receipt. Lonestar also emailed Crouch a set of dimensions necessary for the shop layout. Particularly substantive, however, is an email correspondence between Paul McCoy of Lonestar and Scott Vick of Crouch in April 2016, in which they engaged in a thorough discussion regarding proposed changes to the shop layout.[15] This level of contact exceeds that in *Nicholstone*, and further shows that Lonestar purposefully availed itself of conducting business in this state. *See id*; *see also*

---

[13] In *Bond v. Montego Bay Dev. Corp.*, 405 F.Supp. 256, 257 (W.D. Tenn. 1975), cited favorably by *Nicholstone*, 621 S.W.2d at 566, the contract provided that a Tennessee corporation would produce architectural, mechanical, electrical, and structural plans for the construction of a hotel in Maryland. The court found that the Maryland corporation purposefully availed itself of doing business in Tennessee because the services were performed in Tennessee. *Bond*, 405 F.Supp. at 259.

[14] Lonestar compares this case to *Kerry Steel, Inc. v. Paragon Industries*, 106 F.3d 147 (6th Cir. 1997). However, *Kerry Steel* is easily distinguishable because it did not involve a customized product to be manufactured in the forum state. In that case, the Michigan plaintiff (Kerry Steel) sold $300,000 worth of steel coils to the Oklahoma defendant (Paragon Industries), who then failed to pay. *Id*. at 148. The Sixth Circuit Court of Appeals found that a Michigan court did not have personal jurisdiction over the defendant, in part, because

> …Kerry Steel has alleged no facts connecting either the subject matter of the contract or its performance to the State of Michigan….Paragon took possession of the steel coils in Illinois, title passed there, and Kerry Steel does not even assert that the coils were ever located in Michigan.

*Id*. at 151. Here, there is ample evidence connecting the performance of the contract to Tennessee.

[15] The email exchange is labeled "Exhibit K" and is attached to Scott Vick's affidavit.

*ASSET*, 2018 WL 1391626, at *8 (nonresident defendant communicated frequently with plaintiff to guide plaintiff's performance under the contract).

While Lonestar concedes that it knew Crouch performed most of the services from its offices in Tennessee, it argues that "[a]ny work Crouch did for Lonestar in Tennessee was done in Tennessee because Crouch unilaterally chose to do it there." Lonestar's reasoning mirrors that of the Seventh Circuit in *Lakeside Bridge & Steel Co. v. Mountain State Constr. Co., Inc.*, 597 F.2d 596 (7th Cir. 1979), which ultimately proved unpersuasive to the Court in *Nicholstone*. *See Nicholstone* 621 S.W.2d at 565; *see also Lakeside*, 597 F.2d at 603.[16] Nor is this court persuaded, primarily because the term "unilateral" suggests that only Crouch had a choice regarding where the contract would be performed, and that was not the case. *See* Black's Law Dictionary (10th ed. 2014) (A "unilateral act" is "[a]n act in which there is only one party whose will operates...")

Consider this court's decision in *Covista Commc'ns. Inc. v. Oorah, Inc.*, No E2012-00720-COA-R3-CV, 2012 WL 5504123, at *1 (Tenn. Ct. App. Nov. 14, 2012). There, we determined that the performance of a contract by a Tennessee plaintiff in Tennessee was a unilateral act because the defendant first engaged a Pennsylvania corporation to provide the service, who then assigned the contract to a New Jersey corporation (plaintiff), who then relocated to Tennessee. *Id*. at *6–7. We determined that the defendant's contacts with Tennessee were not purposeful enough for jurisdiction. *Id*. at *7.

We reached this conclusion because at the heart of the minimum contacts test is the due process "fair warning" requirement. *Burger King*, 471 U.S. at 472 (quoting *Shaffer v. Heitner*, 433 U.S. 186, 218 (1977) (Stevens, J., concurring)). It dictates "that individuals [must] have 'fair warning' that a particular activity may subject [them] to the jurisdiction of a foreign sovereign." *Id*. (quoting *Shaffer*, 433 U.S. at 218). The purpose of the "fair warning" requirement is to lend "a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *Id*. (quoting *Word-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

Here, the resumé Crouch provided to Lonestar, prior to contracting, stated that while Crouch's engineers were licensed in 48 states, Crouch's employees and offices

---

[16] In *Lakeside*, the court determined that the plaintiff's performance of the contract in the forum state was a unilateral act, and thus, not indicative of any purposeful targeting of the state by the defendant. *Id*. at 603. Moreover, the court stated that the defendant's belief that the plaintiff "would choose to perform its contractual obligations in Wisconsin does not constitute an invocation of the benefits and protections of Wisconsin's laws." *Id*.

were located in Brentwood, Tennessee.[17] Thus, Lonestar had "fair warning" that the contract would be performed in Tennessee and the opportunity to structure its conduct accordingly. *See id*. Stated differently, by choosing to enter into an agreement with a Tennessee company, Lonestar effectively chose Tennessee as the place of performance. Therefore, the fact that Crouch performed the contract in Tennessee cannot be fairly characterized as unilateral action.

Considering the foregoing circumstances, it is difficult to fathom that Lonestar did not foresee the possibility of having to litigate a contractual dispute in Tennessee when it refused to pay for Crouch's services. *See Nicholstone*, 621 S.W.2d at 564. Accordingly, we have determined that Lonestar purposefully targeted Tennessee when it entered into a business transaction with a Tennessee company for a customized, specialized service to be performed in Tennessee. And, because the cause of action stems directly from Lonestar's alleged breach of the contract—Lonestar's failure to pay the contract price— Lonestar's contacts with Tennessee are sufficient for specific personal jurisdiction in Tennessee. *See id*.

## II.    FAIRNESS

After minimum contacts are established, the burden then shifts to the defendant to show that "despite the existence of minimum contacts, exercising jurisdiction would be unreasonable or unfair." *Sumatra*, 403 S.W.3d at 760. The court considers "[1] the burden on the defendant, [2] the interests of the forum state, [3] the plaintiff's interest in obtaining relief, [4] the judicial system's interest in obtaining the most efficient resolution of controversies, and [5] the state's interest in furthering substantive social policies." *Id.*

As to the first factor, the *Burger King* Court opined that "because 'modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity,' it usually will not be unfair to subject him to the burdens of litigating in another forum for disputes relating to such activity." *Burger King*, 471 U.S. at 474 (quoting *McGee*, 355 U.S. at 223). Considering the technological advancements since *Burger King*, that statement is even truer today. Therefore, we have determined that the burden on Lonestar is not "so substantial as to achieve *constitutional* magnitude." *See id*. at 484 (emphasis in original).

Nevertheless, even if the burden were substantial, when the plaintiff has established minimum contacts, "the interests of the plaintiff and the forum . . . will justify

---

[17] Crouch's resume states, "[Crouch] is a civil engineering firm specializing in railway engineering. We are located in Brentwood, TN, and are a national leader in railway engineering, licensed in 48 states."

even the serious burdens placed on [a non-resident] defendant." *ASSET*, 2018 WL 1391626, at \*9 (quoting *Asahi Metal Indus. Co. v. Superior Court of California, Solano Cty.*, 480 U.S. 102, 114 (1987)). And, as the Court in *Nicholstone* held, "[w]hen the contract is with a resident of Tennessee, the State's interest in resolving a suit based on the contract and brought by that resident cannot be doubted." 621 S.W.2d at 564 (quoting *S. Mach. Co.*, 401 F.2d at 385). Thus the second and third factors weigh in favor of jurisdiction.

As to the fourth factor, the trial court determined that a Tennessee court could not efficiently resolve the controversy because the witnesses were located in Texas. We disagree. Some of the witnesses are located in Texas and some are located in Tennessee. Thus, litigation in Tennessee would be no more or less efficient than litigation in Texas. And, because Lonestar has not made us aware of any substantive social policies of Texas that would be affected by a Tennessee court's exercise of jurisdiction in this case, we find that the exercise of jurisdiction is fair and reasonable.

Accordingly, we reverse the trial court's decision to dismiss the case for lack of personal jurisdiction and remand it for further proceedings.

### IN CONCLUSION

The judgment of the trial court is reversed, and this matter is remanded for further proceedings consistent with this opinion. Costs of appeal are assessed against LS Energy Fabrication, LLC d/b/a Lonestar Energy Fabrication.

_____
FRANK G. CLEMENT JR., P.J., M.S.